# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00338-CR

**The State of Texas, Appellant**

**v.**

**Thomas Fikes, Appellee**

---

**FROM COUNTY COURT AT LAW NO. 8 OF TRAVIS COUNTY**
**NO. C-1 -CR-17-209624**
**THE HONORABLE CARLOS HUMBERTO BARRERA, JUDGE PRESIDING**

---

## O P I N I O N

Appellee Thomas Fikes was charged by information with driving while intoxicated. He filed a motion to suppress the results of a blood-alcohol analysis. The trial court granted the motion to suppress, and the State now appeals. We will reverse the trial court's order suppressing the evidence and remand this cause to the trial court for further proceedings.

## BACKGROUND

Rebecca Morton was the phlebotomist who drew Fikes's blood.[1] Before the blood draw, Morton had arranged various items on the top of the "sharps container," also called the "biohazard bin." After Fikes entered the room, Morton removed a pair of gloves from the top of the sharps container and put them on. While wearing the gloves, she ran her hands through her hair and put on a sweater. Fikes sat in a chair that was near both the sharps container and a small

---

[1] At the suppression hearing, the State introduced a video of the blood draw.

trash can. Morton applied a tourniquet to Fikes's arm that she had removed from the top of the sharps container. She then removed two unopened packages of disinfectant wipes from the top of the sharps container, opened one package, and wiped Fikes's arm. She threw the package and used wipe into the trash can, opened the other package, wiped Fikes's arm again, and threw the second package and wipe into the trash. Morton then removed a piece of gauze that was not in a package from the top of the sharps container and placed it on the armrest of Fikes's chair. She also removed a syringe in a package from the top of the sharps container, opened the package, and filled two vials with Fikes's blood.

After drawing the blood, Morton removed the tourniquet, threw the used syringe into the opening on the top of the sharps container, and placed the gauze on Fikes's arm, placing the side of the gauze that had been facing up when it was sitting on the sharps container on his arm. Morton labeled the vials and then removed an adhesive bandage from the top of the sharps container. The bandage's wrapper was partially opened, and the exposed part of the bandage had been sticking to the container. She applied the bandage to Fikes's arm. Morton then threw the bandage wrapper and her gloves into the trash can.

At the suppression hearing, Morton testified to the following:

- She used the top of the sharps container because "it provides a nice, flat surface to have everything there so that you're not having to turn around." She did not like to turn her back to the arrestees, who might not be cooperative.

- The sharps container has a one-way valve so that nothing comes back out of the container.

- Based on her usual practice, she assumes that she used bleach wipes to wipe down all the surfaces in the room, including the top of the sharps container, at the beginning of her shift.

- The people from whom she draws blood are not always clean. As Morton testified, "[T]he level of cleanliness of the person I'm drawing the blood on is a huge factor because there

2

are plenty of people who haven't showered in days, who just came from wrestling in the gravel, who totaled their car."

- She does not usually clean the sharps container between blood draws.

- She does not know whether Fikes was the first blood draw of her shift.

- She cannot name anyone else who uses the sharps container as a workstation.

- She does not know whether using the sharps container as a workstation is recognized by the scientific community or is standard medical practice.

- She now has a table to use as a workstation, and the sharps container is attached to the wall. She cannot remember when the table was installed.

- The part of the bandage that touched the puncture in Fikes's arm was still closed when the bandage was stuck to the sharps container.

Morton was the State's only witness. Fikes then called Joseph Urena, who testified to the following:

- He works at St. David's as a certified phlebotomist and phlebotomy trainer. He has been doing that job for "well over two decades" and has been training phlebotomists for at least 15 years.

- He is responsible for "reeducation" if phlebotomists or nurses are not following procedures.

- A biohazard container is not considered clean and is not a work surface.

- "[A]ny kind of blood pathogen whatsoever" can potentially be on the top of the sharps container.

- Hepatitis C can live in dry blood up to three weeks on a surface like the sharps container.

- HIV can live for up to three hours.

- If a person touches her hair with gloves on, the gloves are no longer considered clean, and it is standard procedure for the person to change gloves before drawing blood.

- There can be "transference" from the top of the biohazard container to gauze.

3

- In "a hospital setting or pretty much any medical setting," the biohazard container should not be sitting on the floor and should instead be attached to the wall.

- It is possible for blood to splash back up from the needle to the top of the biohazard container. These blood droplets can be microscopic, but even a microscopic portion of blood can be "enough to get somebody sick."

- Phlebotomists at St. David's would not be allowed to use a sharps bin as a workstation. When asked what would happen if a phlebotomist at St. David's did use the sharps bin, Urena responded, "Well, I mean, it's possible they would be written up. If it continues on it could go—I mean, we just don't see that really happen." Although the phlebotomist would be "written up," the blood would not be discarded, and they would "still medically rely" on the blood specimen.

- He watched the video of Fikes's blood draw. He would not characterize this blood draw as "following standard phlebotomy procedures." He affirmed that this type of behavior could "possibly lead to risk of infection or disease to a patient."

The trial court recessed the proceedings, and the hearing resumed at a later date. After hearing argument from counsel, the trial court stated the following:

> I have no problem with the sealed sterile gauze used to wipe his arm or the needle or anything like that, but that bare four-by-four gauze on top of the sharps container and that open Band-Aid adhered to it, you know, that are applied directly to the puncture site, to me that's just way beyond the pale so I do grant the Motion to Suppress.

The trial court signed an order granting Fikes's motion to suppress and issued findings of fact and conclusions of law. The court made the following findings and conclusions, among others:

- "On the floor just in front of the chair upon which Fikes sat for his blood draw was a sharps container box labeled biohazard, conveniently to the left of Morton as she drew Fikes's blood."

- "On the top of the sharps container Morton had placed a bare 4 by 4 inch gauze pad to be used, and used, to wipe Morton's [sic] puncture wound after the draw."

- "Hanging from the top front edge of the sharps container Morton adhered a somewhat opened 'band aid' to be used, and used, to cover Fikes's puncture wound after the draw."

4

- "The open gauze and 'band aid' as placed and used posed an extreme potential risk of contamination and infection to Fikes."

- "Although the general environment of the blood draw room may have been clean and sanitary, the exposure of the 4 by 4 gauze and the 'band aid' on the biohazard sharps container exposed Fikes to an unjustifiable risk of infection [and] was therefore a violation of the Fourth Amendment of the United States Constitution as an unreasonable search."

This appeal followed.

## APPLICABLE LAW AND STANDARD OF REVIEW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *State v. Villarreal*, 475 S.W.3d 784, 795 (Tex. Crim. App. 2014) (citing *Riley v. California*, 573 U.S. 373, 381 (2014)). "The drawing of a person's blood is a search under the Fourth Amendment." *Roop v. State*, 484 S.W.3d 594, 598 (Tex. App.—Austin 2016, pet. ref'd); *see Schmerber v. California*, 384 U.S. 757, 769 (1966) (describing blood draws as "searches involving intrusions beyond the body's surface"). Indeed, as the Supreme Court has recognized, "[s]uch an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)).

"A blood draw is reasonable under governing Fourth Amendment requirements if the police had a justification for requiring the blood sample to be taken and if reasonable means and procedures were used in obtaining the blood sample." *State v. Gray*, No. 03-17-00174-CR, 2017 WL 2729672, at *2 (Tex. App.—Austin June 22, 2017, no pet.) (mem. op., not designated for publication) (citing *State v. Johnston*, 336 S.W.3d 649, 658 (Tex. Crim. App. 2011)). "When

5

assessing whether the second requirement is met, reviewing courts must consider whether the test chosen by the police was reasonable and whether the test was performed in a reasonable manner." *Id.* (citing *Schmerber*, 384 U.S. at 771). "If a defendant seeks to suppress evidence on the basis of the Fourth Amendment, the burden of proof is on the defendant to overcome the presumption of proper police conduct." *Martinez v. State*, 220 S.W.3d 183, 186 (Tex. App.—Austin 2007, no pet.); *see State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019).

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *See State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). We view the record in the "light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). Furthermore, we use a bifurcated standard, *see Roop*, 484 S.W.3d at 597, "giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see Morales Chavez v. State*, No. 03-17-00637-CR, 2019 WL 2293566, at *2 (Tex. App.—Austin May 30, 2019, no pet.) (mem. op., not designated for publication) ("[W]e review a trial court's application of search and seizure law to the facts de novo."). In cases involving video evidence, we "view the video in the light most favorable to the trial court's ruling," *State v. Espinoza*, No. 08-16-00087-CR, 2018 WL 6259210, at *3 (Tex. App.—El Paso Nov. 30, 2018, no pet.) (not designated for publication), although we review de novo "indisputable visual evidence," *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013).

**DISCUSSION**

In the trial court, Fikes argued, and the court agreed, that Fikes's blood draw violated the Fourth Amendment because it exposed Fikes to an unjustified risk of infection. Fikes relies on *Schmerber v. California*, in which the Supreme Court stated:

> [T]he record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.
>
> We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Schmerber*, 384 U.S. at 771–72.

Fikes contends that, unlike in *Schmerber*, his blood draw exposed him to an unjustifiable risk of infection because Morton used a sharps container as a workstation. In two appellate issues, the State contends that the blood draw did not violate the Fourth Amendment and that, even if it did, the trial court abused its discretion in suppressing the results of the blood test.

As the State admits, using a biohazard container as a workstation for a blood draw is not ideal. However, even viewing the evidence in the light most favorable to the trial court's ruling, we conclude that Fikes failed to meet his burden of showing that Morton's actions were so egregious that they created an "unjustified element of personal risk of infection and pain" that rose

7

to the level of violating the Fourth Amendment. *See id.* at 772. Although Urena testified that pathogens can live on the top of the container and be spread through contact with blood, Fikes presented no evidence concerning the likelihood that Morton's actions would spread a pathogen. Morton testified that it was her practice to disinfect each surface at the beginning of her shift, including the sharps container, and Fikes presented no evidence of how many people, if any, Morton drew blood from that shift before drawing his blood. Finally, Fikes presented no evidence that any part of the gauze or bandage that touched the sharps container later made contact with his puncture site.[2]

Because the record before us does not demonstrate that Fikes's blood draw violated the Fourth Amendment by subjecting him to an unjustified risk of infection, we conclude that the trial court abused its discretion in granting his motion to suppress the results of the blood analysis. *See Zalman v. State*, No. 13-13-00471-CR, 2015 WL 512914, at *9 (Tex. App.—Corpus Christi Feb. 5, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding that "appellant has not shown that the blood draw was unreasonable" despite presence of insects in room during blood draw); *Adkins v. State*, 418 S.W.3d 856, 861 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("Appellant presented evidence at trial that the cotton ball used to clean the injection area was placed on a table before it was used. This alone, however, is not enough evidence to prove that the environment or the procedure presented an unjustified risk of infection or pain."); *Gambini v. State*,

_____

[2] The State argues on appeal that the search and seizure ended the moment that Morton finished extracting blood from Fikes's arm and that the application of the gauze and bandage was therefore not part of the search. Because we conclude that there was no Fourth Amendment violation even considering the application of the gauze and bandage, we need not, and do not, decide whether the State is correct about when the search and seizure concluded. We do note, however, that the issue of whether Fikes could assert a Fourth Amendment violation is not a jurisdictional question of standing, as the State seems to contend. *See Byrd v. United States*, 138 S. Ct. 1518, 1530–31 (2018).

No. 01-12-00395-CR, 2013 WL 4680380, at \*5 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's argument that "the procedures used to take her blood were unreasonable" even though nurse who drew her blood "touched his nose, mouth, and hair, as well as [appellant's] leg and the straps on the chair" with his gloved hands); *see also State v. May*, 112 P.3d 39, 41–42 (Ariz. Ct. App. 2005) (holding that the trial court did not err in denying defendant's motion to suppress blood draw evidence even though deputy drew his blood "while they stood at the rear of a police car").

Accordingly, we sustain the State's first appellate issue. Because we reverse the trial court's order on this basis, we need not reach the State's remaining issue.

## CONCLUSION

Fikes failed to show that his blood draw was an unreasonable search and seizure that violated the Fourth Amendment, and the trial court abused its discretion in granting his motion to suppress. Therefore, we reverse the trial court's order granting Fikes's motion to suppress and remand this cause to the trial court for further proceedings consistent with this opinion.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Reversed and Remanded

Filed: September 6, 2019

Publish

9